Filed 6/30/23  8minutenergy US Manager v. MDS Capital CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| 8MINUTENERGY US MANAGER, LLC et al., <br><br>     Plaintiffs and Respondents, <br><br> v. <br><br> MDS CAPITAL, LLC et al., <br><br>     Defendants and Appellants. | A165588 <br><br> (City & County of San Francisco Super. Ct. No. CPF-22-517713) |

This action arises out of a failed joint venture to develop solar energy projects.  Appellants, Class B investors in the joint venture,[1] appeal from an order confirming an arbitration award in favor of Thomas Buttgenbach, 8minutenergy US Manager, LLC (Manager), and 8minutenergy US Investor, LLC (Managing Member) (collectively respondents).  Appellants contend the trial court should have vacated the award because the arbitrator exceeded her authority by remaking or removing various terms of the parties' contracts and awarding relief that was not authorized by contract or law.

---

[1]     The Class B investors are comprised of MDS Capital, LLC, PEG Direct Global Private Equity Institutional Investors VI, LLC, PEG Direct Global Private Equity VII L.P., PEG U.S. Direct Corporate Finance Institutional Investors V LLC, Nickel Alternatives, LLC, Tahoe Private Equity Fund L.P., Courier Private Equity Fund L.P., and PEG US 8ME Blocker, LLC.

1

Given the highly deferential and limited nature of judicial review of contractual arbitration awards, we see no basis to reverse the trial court's decision. The arbitral rulings in question involved arguable constructions of the parties' contracts and remedies rationally related to the contracts, and as such, appellants did not demonstrate that the arbitrator exceeded her authority. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We take the following facts from the arbitrator's written arbitration award and treat them as correct without examining the arbitration record. (See *Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 367, fn. 1 (*AMD*).)

**A. Formation of the Joint Venture**

Dr. Buttgenbach was the co-founder, principal owner, and leader of a company doing business as 8minute Solar Energy LLC (8minute Solar), which "had a thriving pipeline of solar projects that were already known for innovations in the renewable sector." In 2018, the private equity firm Upper Bay Infrastructure Partners (Upper Bay) approached 8minute Solar with the goal of investing in the solar energy sector. The parties eventually formed 8minutenergy US Solar LLC (hereafter the "joint venture" or the "Company"). After Upper Bay raised hundreds of millions of dollars in investment capital, the parties entered into the operative Third Amended Limited Liability Company Agreement of 8minutenergy US Solar LLC (LLCA), Amended Management Services Agreement (MSA), and Mutual Release.

A few provisions of these agreements bear early mention.

2

### 1. LLCA

Article 11 of the LLCA (§§ 11.1–11.9.6) sets forth the members' rights to the Company's financial information. Under section 11.2, the Company was required to make available "all records and historical information . . . for inspection and copying upon reasonable notice by any Member or its representative at any reasonable time during business hours and at such Member's expense for any purpose reasonably related to the Member's interest in the Company." Members also had the right, upon reasonable notice, to visit the Company's principal office and facilities to inspect its books and records, provided the notice stated a purpose that was reasonably related to the member's interest in the Company.

Section 11.5 entitled appellants to receipt of audited annual financial statements within 120 days after the end of the fiscal year (§ 11.5.2); unaudited quarterly financial statements within 45 days after the end of the first, second, and third quarters of each fiscal year (§ 11.5.1); and quarterly updates regarding certain financial matters (e.g., issuance of letters of credit) within 45 days after the end of any applicable quarter (§ 11.6).

Section 14.20, entitled "Dispute Resolution," contained the parties' agreement to arbitrate "[a]ll claims, controversies or disputes of any type arising out of or related to the Company or this Agreement or the breach thereof . . . pursuant to JAMS Comprehensive Arbitration Rules and in accordance with the JAMS Expedited Procedures" (hereafter JAMS Rules).

Section 4.6.1 of the LLCA required Managing Member to cause the Company to "operate in accordance with the Five-Year Budget." Under section 5.6, board approval was required to amend the budget or to allow for any budget deviation.

Article 13 (§§ 13.1–13.5) set forth the procedures for unwinding and dissolving the Company in the event the board became deadlocked over a "Major Business Decision" requiring board approval.

### 2. MSA

Under the MSA, Manager agreed to provide the Company with "all services necessary in connection with the ownership, development, acquisition, management and disposition of the Projects and management of the Company," including specific " '**Management Services**' " described in an exhibit to the MSA. In return, the Company would reimburse Manager for its "Management Costs"—e.g., "all actual costs and expenses incurred by Manager and its Affiliates for the performance of the Management Services that Manager reasonably and in good faith determines directly benefits the Company." However, Manager did "not have the right to receive payment for any Management Costs that would result in a Five-Year Budget Deviation or Additional Budget Deviation" unless the budget was modified or the payment was approved by the board.

### 3. Mutual Release

Under the Mutual Release, the parties agreed to release one another from "any and all known and unknown claims . . . related to or arising out of" the parties' prior limited liability company agreements and management services agreements. Expressly excluded from release was the "payment of Management Costs under the [p]rior MSA for periods prior to the date hereof in accordance with the terms and subject to the conditions set forth in the [MSA] that are currently estimated at $75,000,000 and shall not exceed $79,000,000."

4

### B. Parties' Disputes

The parties' relationship was "adversarial . . . from the very beginning." Three main disputes led to the unwinding of the Company.

#### 1. OpCo

The first dispute was Dr. Buttgenbach's proposal to develop a separate operating company (OpCo) to construct and operate projects. According to the arbitrator, this type of arrangement was not unusual in the solar business, was contemplated in the LLCA, would have benefitted the joint venture, and was structured not to undercut competitive bidding for the Company's projects. Nevertheless, appellants were "vehemently opposed to the plan" because they viewed it as "Dr. Buttgenbach's attempt at self-dealing."

#### 2. $7.5 Million Reimbursement

The second dispute arose from respondents' demand for reimbursement of a $7.5 million security deposit that Dr. Buttgenbach had made to NV Energy for the Eagle Shadow Mountain project in Nevada. Appellants maintained that the claim was either released under the Mutual Release or barred because transferring this amount would exceed the $79 million cap on total management costs.

#### 3. D.E. Shaw Renewable Investments (DESRI)

The third dispute arose from respondents' proposed sale of a solar project to DESRI. As the arbitrator found, DESRI was "one of the most qualified buyers in the solar industry" and "needed 8minute Solar's technical expertise" for a complex battery technology. However, appellants claimed the sale would involve self-dealing by Dr. Buttgenbach and refused to approve it. In October 2020, appellants issued a breach notice and threatened litigation if respondents moved ahead with the DESRI deal.

## C. Deadlock

Prior to the October 2020 board[2] meeting, the parties continued their negotiations over OpCo. "[A]lthough Class A attempted to modify the structure with price protections and the like, Class B refused to cooperate in this effort [citation]. When the issue finally was presented for a vote by the Board on October 20, 2020, Class B opposed the measure and left the Board deadlocked over this Major Business Decision."

In December 2020, respondents delivered a formal deadlock notice to appellants.

## D. Arbitration Demand and Counterclaims

In February 2021, appellants filed a demand for arbitration with JAMS alleging that: Dr. Buttgenbach and Managing Member defrauded appellants "by providing false and inflated financial projections to induce the Class B Investors to invest substantial amounts of capital in the Company and subsequently to support a significant financing arrangement"; respondents pursued conflicted projects in material breach of the LLCA; Dr. Buttgenbach and Managing Member failed to comply with their duty to produce books, records, and other financial information; and Manager and Managing Member committed an anticipatory breach by wrongfully requesting reimbursement of $7.5 million.

Respondents asserted counterclaims against appellants for: obstructing project sales in breach of the LLCA; tortiously interfering with project sales to DESRI; sharing confidential information; and breaching the implied covenant of good faith and fair dealing.

---

[2]     The board was made up of two members from the Class A investors and two members from the Class B investors.

**E. Alleged Breaches of Informational and Inspection Rights**

While arbitration proceedings were pending, the deadline for delivery of the audited financial statement for fiscal year 2020 passed without the audit being completed on time. (The audited financial statement for fiscal year 2020 would not be delivered until January 31, 2022.)[3]

In July 2021, appellants' agent attempted to perform a three-day site visit at the Company but was given limited access only for one day.

**F. Unwinding Notice**

In July 2021, the Class A investors became "persuaded that the parties were hopelessly deadlocked" and directed Managing Member to issue an unwinding notice. As required under the LLCA, the unwinding notice set forth "the status of each project in the pipeline including an estimate of needed funding and a timeline." Appellants had 30 days after issuance of the unwinding notice to deliver a written "Designated Project Notice" (DPN) designating any projects they wished to continue to fund. The Managing Member would then deliver written notice to the Class A and Class B investors of their contributions amounts "sufficient to fund each Designated Project until it is sold by the Company" (hereafter the Designated Project Contributions Notice or DPCN). The Class A and B investors then had 60 days after the DPCN to contribute their share of funds for the designated projects, with Class A required to contribute 12.5 percent of the funds, and Class B required to contribute the remaining 87.5 percent.

---

[3]     Appellants also claim that respondents failed to timely deliver quarterly financial statements in 2021, as well as a quarterly report disclosing a letter of credit issued to the Company in July 2021. However, as discussed *post*, the arbitrator found no material breach of the LLCA provisions regarding quarterly financial statements and reports.

Appellants initially moved to enjoin the unwinding process, but the arbitrator denied their request. Appellants then made other "attempts to disrupt and stop" the unwinding process, all to no avail. In early August 2021, appellants delivered their DPN designating all 73 of the joint venture's projects for funding. In turn, Dr. Buttgenbach issued DPCNs to both appellants and respondents seeking their respective cash contributions to fund the designated projects.

On August 19, 2021, the Class B board members sent Dr. Buttgenbach an "extensive Request for Information" (hereafter the August 19 letter), claiming the DPCN materially deviated from the Company's five-year budget, and demanding production of a variety of documents (including emails, instant messages, and text messages) concerning the preparation of the DPCN and other matters. The August 19 letter also demanded a site visit, with "full and unfettered access, for inspection and copying," of the Company's books and records.

Respondents rejected appellants' request for an additional site visit. Furthermore, after appellants failed to deliver their share of contributions to fund the designated projects, respondents issued a contribution default notice. Pursuant to section 7.1.3 of the LLCA, in the event of a "Contribution Default" relating to a DPCN, respondents had the right "to purchase the non-funding Investor's interest in each of its Designated Projects for an amount equal to $1.00."[4]

---

[4] Accordingly, in December 2020, Managing Member delivered payment by check of $73 to appellants to purchase the entire project pipeline.

## G. Dismissal of Claims, and Amended Claims and Counterclaims

Ten days before the arbitration hearings were scheduled to begin, appellants' then-counsel, the Bracewell law firm, withdrew from representation under a "cloud of claimed ethical breaches" involving use of the Company's attorney-client privileged information to give appellants an "upper hand in negotiations with Dr. Buttgenbach and others at [the Company]." After appellants' new counsel assumed representation, appellants dismissed their original arbitration claims "with prejudice."

In late August 2021, appellants filed an amended demand for arbitration, asserting 13 new claims across five general categories: (1) respondents breached the LLCA by issuing the unwinding notice and DPCN with cost projections that exceeded the five-year budget; (2) the unwinding notice and DPCN did not comply with LLCA requirements; (3) respondents breached the implied covenant of good faith and fair dealing; (4) respondents breached the LLCA by blocking appellants from selling their interests in the Company; and (5) respondents violated appellants' informational and inspection rights under the LLCA and section 18-305 of the Delaware Limited Liability Company Act (hereafter the LLC Act) by failing to timely deliver financial statements and denying them inspection of the Company's books and records.

Respondents filed amended counterclaims seeking, in relevant part, prejudgment interest on the repayment of the $7.5 million, and a declaratory judgment that the unwinding notice was valid.

## H. Arbitration Hearings and Decision

The arbitration hearings took place in December 2021. In February 2022, the arbitrator issued a final award in favor of respondents.

9

As relevant here, the arbitrator found that appellants made bad faith claims of anticipatory breach regarding the reimbursement of the "misdirected $7.5 million deposit," despite respondents' repeated explanations that the money was a security deposit that was "mistakenly refunded to the JV, not the parent company." Because appellants "continued to dispute the matter until this claim was dismissed with prejudice on the eve of trial," the arbitrator found that respondents were entitled to "prejudgment interest at the legal rate of 5.25 percent on the $7.5 million that was misdirected and not yet returned [citation]. The total amount of interest due to [the Company] is $490,839.04, running from October 30, 2020, to the end of February 2022."

The arbitrator also rejected appellants' claim that the unwinding notice and DPCN breached the budgetary provisions of the LLCA. Crediting the testimony of Dr. Buttgenbach and respondents' expert, Robert Gurman, over that of appellants' expert, Seabron Adamson, the arbitrator found that the DPCN and the five-year budget had "entirely different functions" because the budget was "an operating budget while the [DPCN] is project-focused, not operations-focused, and is part of LLCA Article 13 regarding the Unwinding." Because the DPCN "does not assume the continued operations of the company and relates to circumstances involving termination of the operations of the company," the arbitrator found that board approval was not required for the unwinding notice or DPCN, which were "left to the Managing Member."

The arbitrator also found that appellants failed to prove violations of their informational and inspection rights under the LLCA and section 18-305 of the LLC Act. According to the arbitrator, the Company "did produce a lot of documents as set forth in Mr. Gurman's rebuttal report," and the

10

arbitrator credited Gurman's testimony that "Manager and Managing Member did provide Class B with the required information disclosures pursuant to the LLCA." The arbitrator further noted that the Company "objected to a number of the overbroad requests as well as to a July 2021 forensic audit . . . that demanded unfettered access to all the JV's books and records. Those requests went well beyond the requirements of the LLCA [citation]. [Respondents] explain that they did provide the usual business records to [appellants] but objected to litigation discovery requests made in August 2021." As for appellants' statutory claim under section 18-305, the arbitrator remarked in a footnote that "Class B has no rights in addition to those set forth in the LLCA under Delaware's LLC Act, section 18-305."

Although the arbitrator recognized that "the audited financials [were] late," the arbitrator found that "[t]he audit [was] delayed because the Board voted late in the first quarter of 2021 to replace its auditor and appoint Deloitte as the new auditor. Deloitte has not yet completed its work." The arbitrator concluded that appellants "did not prove that Managing Member or Manager violated the informational rights set forth in the LLCA."

Finally, the arbitrator found that respondents were entitled to their reasonable attorney fees and expenses pursuant to section 5.9.2 of the LLCA.[5] Among the amounts requested by respondents were over $5.5 million in fees for an investigation performed by the law firm of Brown Rudnick into

---

[5] Under section 5.9.2, in the event of an alleged breach of the LLCA by the Manager, the parties "shall resolve such dispute in accordance with the dispute resolution procedures set forth in Section 14.20; provided, however, that the fees and expenses of such arbitration proceedings (including, without limitation, reasonable attorneys' fees) shall be borne . . . 100% by the Class B Investors . . . if the arbitrators determine that such Alleged Breach does not constitute a Management Breach."

"the fraud allegations asserted against [the Company]" by appellants. The arbitrator observed that "some of this work was performed in connection with the arbitration and some was performed as part of the ongoing management of the business," but that "a precise calculation [was] not possible based on the information submitted." Nevertheless, the arbitrator found it "clear that [appellants'] claims of fraud that were later dismissed with prejudice caused much of this cost. Therefore, [respondents] are awarded a portion of this claim: $4,514,624."

## I. Trial Court Proceedings

Respondents petitioned the trial court to confirm the arbitration award. Appellants opposed the petition and cross-petitioned to vacate the award. The court granted respondents' petition, denied appellants' cross petition, and entered judgment in favor of respondents.

As relevant here, the trial court found that it "cannot revisit" the arbitrator's factual determinations that the Brown Rudnick investigation costs were related to the arbitration, or that respondents were entitled to prejudgment interest on their $7.5 million claim. The court found "[t]he arbitrator was entitled to conclude that the money was misdirected to the joint venture when it should have gone to [the Company]."

The trial court further concluded the arbitrator did not act irrationally in finding that "the budgetary provision did not apply in the circumstances of this case." As to appellants' informational rights claims, the court found that "[t]he award need not be vacated because [respondents] did not comply with the letter of the informational rights provisions. The arbitrator apparently concluded that the delay was excused since a new auditor was appointed and the work had yet to be completed. The arbitrator had the discretion to excuse the breach."

12

Finally, the trial court awarded respondents' their fees and costs for the postarbitration proceedings in court. Citing section 5.9.2 of the LLCA, which provides for the shifting of " 'fees and expenses of such arbitration proceedings,' " the court found that "the confirmation or vacation of an arbitration award is part of the 'arbitration proceedings.' The clause is therefore broad enough to allow [respondents] to recover the claimed $36,653 as reasonable fees for this work."

This appeal followed. (Code Civ. Proc., § 1294, subd. (d) [right to appeal from judgment confirming arbitration award].)[6]

## DISCUSSION

"Arbitration awards are generally subject to narrow judicial review because of the strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution. [Citation.] Thus, courts will not review the merits of the controversy, the validity of the arbitrator's reasoning, or the sufficiency of the evidence supporting the arbitrator's award. [Citation.] Typically, an arbitrator's factual and legal errors are also not reviewable because the arbitrator's (as opposed to the court's) resolution of the disputed issues ' " 'is what the parties bargained for in the arbitration agreement.' " ' " (*California Union Square L.P. v. Saks & Co. LLC* (2020) 50 Cal.App.5th 340, 348 (*California Union Square*).)

However, section 1286.2 provides that courts "shall" vacate an arbitration award under specified grounds. Here, the sole statutory ground cited by appellants in support of vacatur is section 1286.2, subdivision (a)(4), which requires that an arbitration award be vacated if the court determines that "[t]he arbitrators exceeded their powers and the award cannot be

---

6    Further unspecified statutory references are to the Code of Civil Procedure.

13

corrected without affecting the merits of the decision upon the controversy submitted."

"An arbitrator exceeds his [or her] powers when he [or she] acts without subject matter jurisdiction [citation], decides an issue that was not submitted to arbitration [citations], arbitrarily remakes the contract [citation], upholds an illegal contract [citation], issues an award that violates a well-defined public policy [citation], issues an award that violates a statutory right [citation], fashions a remedy that is not rationally related to the contract [citation], or selects a remedy not authorized by law [citations].  In other words, an arbitrator exceeds his [or her] powers when he [or she] acts in a manner not authorized by the contract or by law." (*Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 443 (*Jordan*).)  "In determining whether an arbitrator exceeded his or her powers, we look to the parties' arbitration agreement to see if and how it limited the arbitrator's authority because arbitrators have no powers beyond those conferred upon them by the arbitration agreement." (*California Union Square, supra,* 50 Cal.App.5th at pp. 348–349.)

Importantly, " 'arbitrators do not exceed their powers merely because they assign an erroneous reason for their decision.' " (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 28 (*Moncharsh*).)  Even "an error of law apparent on the face of the award that causes substantial injustice does not provide grounds for judicial review." (*Id.* at p. 33.)  "Absent an express and unambiguous limitation in the contract or the submission to arbitration, an arbitrator has the authority to find the facts, interpret the contract, and award any relief rationally related to his or her factual findings and contractual interpretation." (*Gueyffier v. Ann Summers, Ltd.* (2008) 43 Cal.4th 1179, 1182 (*Gueyffier*).)  " '[A]s long as the arbitrator is even arguably

14

construing or applying the contract and acting within the scope of his [or her] authority, that a court is convinced he [or she] committed serious error does not suffice to overturn his [or her] decision.' " (*AMD*, *supra*, 9 Cal.4th at p. 378.)

"In determining whether an arbitrator exceeded his [or her] powers, we review the trial court's decision de novo, but we must give substantial deference to the arbitrator's own assessment of his [or her] contractual authority." (*Jordan*, *supra*, 100 Cal.App.4th at pp. 443–444.) "In close cases the arbitrator's decision must stand." (*AMD*, *supra*, 9 Cal.4th at p. 381.)

## A. Arbitrarily Remaking the Contracts

Appellants contend the arbitrator exceeded her authority by remaking the following contractual terms between the parties: (1) the LLCA's provisions requiring the Company to operate within a five-year budget and to obtain board approval for any deviations from the budget; (2) the LLCA's provisions entitling appellants to receive timely financial statements and to inspect the Company's books and records; and (3) the Mutual Release, which either released respondents' $7.5 million claim, or barred it due to the cap on total management costs.

### 1. Five-Year Budget

Appellants fail to demonstrate that the arbitrator's decision "arbitrarily rema[de]" the budgetary provisions of the LLCA. (*Jordan*, *supra*, 100 Cal.App.4th at p. 443.) To the contrary, the arbitrator appears to have interpreted the scope of these terms—in particular, the requirement under section 4.6.1 that the Company "operate" in accordance with the five-year budget—and found them inapplicable to the "project-focused, not operations-focused" expenses projected under the unwinding notice and DPCN.

15

Appellants nevertheless contend the arbitrator impermissibly relied on sources extrinsic to the LLCA to reach her decision. We disagree. While the arbitrator cited testimony from Dr. Buttgenbach and expert Gurman, we are not "*compelled* to infer the award was based on an extrinsic source" rather than an interpretation of the contract. (*AMD*, *supra*, 9 Cal.4th at p. 381.) The arbitrator appears to have relied on the testimony—specifically, the witnesses' distinction between the "operations-focused" budget and the "project-focused" DPCN— to aid in her interpretation of the LLCA. Thus, the arbitrator was still "arguably construing or applying the contract" and was therefore acting within the scope of her authority. (*AMD*, *supra*, 9 Cal.4th at p. 378.)

Appellants suggest it was error for the arbitrator to rely on extrinsic evidence to interpret the LLCA because the budgetary provisions were unambiguous.[7] While the arbitrator did observe that "[n]either side claims that the contract is ambiguous," the arbitrator appears to have implicitly found ambiguity given her reliance on testimony to interpret section 4.6.1. (See *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1357 [expert testimony admissible as to industry custom and usage of latently ambiguous contract language].) In any event, even assuming it was legal error for the arbitrator to rely on expert testimony to interpret the LLCA, the arbitrator did not exceed her powers simply by reaching erroneous conclusions on issues of law or fact. (*Safari Associates v. Superior Court* (2014) 231 Cal.App.4th 1400, 1408.)

---

[7] As previously mentioned, appellants also submitted expert testimony to support their contention that the unwinding notice and DPCN exceeded the five-year budget.

*Aspic Eng'g & Constr. Co. v. EEC Centcom Constructors, LLC* (9th Cir. 2019) 913 F.3d 1162 does not compel a contrary conclusion, as the arbitrator's decision in that case was not based on an attempt to interpret the subcontract in question. Rather, the arbitrator concluded that an Afghani subcontractor could not be expected to comply with United States Federal Acquisition Regulation (FAR) provisions incorporated by reference into the subcontract because the business practices of subcontractors in Afghanistan were more " ' "primitive" ' " than those of U.S. subcontractors. (*Id.* at p. 1168.) In so concluding, the arbitrator "evaded" the provisions of the subcontract incorporating the FAR clauses and "failed to draw the essence of the Award from the Subcontracts." (*Ibid.*) Here, in contrast, the arbitrator did not evade the budgetary provisions of the LLCA but interpreted them to conclude the projected expenses under the unwinding notice and DPCN were not subject to the five-year budget.

In sum, appellants fail to demonstrate that the arbitrator remade the LLCA's budgetary provisions in excess of her powers.

### 2. Informational and Inspection Rights

#### a. Right to Inspect Books and Records (LLCA § 11.2)

The arbitrator rejected appellants' claim that they were denied their right to inspect the Company's books and records pursuant to section 11.2 of the LLCA and section 18-305 of the LLC Act. Specifically, the arbitrator found that appellants' demand for "unfettered access" to the Company's books and records went "well beyond the requirements of the LLCA," and that section 18-305 of the LLC Act did not afford appellants any rights beyond those set forth in the LLCA.

As such, the arbitrator's decision was based on an interpretation of the scope of the inspection rights afforded under section 11.2 of the LLCA, as well

17

as a determination that section 18-305 of the LLC Act did not provide a basis for further liability.[8]  These arguable constructions of the LLCA, vis-à-vis section 18-305 of the LLC Act, were within the arbitrator's powers and are not subject to judicial review, even if erroneous.  (*AMD*, *supra*, 9 Cal.4th at p. 378; *Moncharsh*, *supra*, 3 Cal.4th at p. 28.)

Appellants maintain the arbitrator's finding that they had no statutory rights in addition to those set forth in the LLCA "directly contradicts" section 11.2 of the LLCA, which applies "[w]ithout limiting the rights of either the Company and its representatives, or the Members, under Section 18-305 of the [LLC] Act."  Reasonably read, this nonlimitation clause avoids an application of section 11.2 that would confer narrower inspection rights than under Delaware law.  Here, however, the arbitrator determined that the joint venture members' rights under section 11.2 of the LLCA were coextensive with section 18-305 of the LLC Act, and furthermore, that section 11.2 was not breached.  Thus, the arbitrator's decision did not, as appellants contend,

---

[8]     Section 18-305 of the LLC Act lists the following categories of information that members of a limited liability company have the right to inspect:  "(1) True and full information regarding the status of the business and financial condition of the limited liability company; [¶] (2) Promptly after becoming available, a copy of the limited liability company's federal, state and local income tax returns for each year; [¶] (3) A current list of the name and last known business, residence or mailing address of each member and manager; [¶] (4) A copy of any written liability company agreement and certificate of formation and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which the limited liability company agreement and any certificate and all amendments thereto have been executed; [¶] (5) True and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each member and which each member has agreed to contribute in the future, and the date on which each became a member; and [¶] (6) Other information regarding the affairs of the limited liability company as is just and reasonable."  (6 Del. C., § 18-305, subd. (a).)

18

contradict the nonlimitation clause or "remove[] the statutory protections of Delaware law." (See *T. Wall Props. MLP v. Vanta Commer. Props., LLC*, 2015 Del.Ch. Lexis 318, *3, *6–7 [courts need not reach section 18-305 of LLC Act claim where agreement provides contractual inspection rights that exceed rights under LLC Act].)

In sum, appellants fail to demonstrate that the arbitrator remade section 11.2 of the LLCA or exceeded her authority as to appellants' rights under section 18-305 of the LLC Act.

### b. Unaudited Quarterly Financial Statements (§ 11.5.1) and Quarterly Financial Updates (§ 11.6)

The arbitrator also rejected appellants' claim for breach of sections 11.5.1 and 11.6 of the LLCA, finding that the Company produced "a lot of documents as set forth in Mr. Gurman's rebuttal report," and crediting Gurman's testimony that "Manager and Managing Member did provide Class B with the required information disclosures pursuant to the LLCA." The arbitrator also found that respondents properly objected to litigation discovery requests made in the August 19 letter. These factual findings, based on the arbitrator's interpretation of the informational rights provisions of the LLCA, are not subject to judicial review. (*Gueyffier*, *supra*, 43 Cal.4th at pp. 1184–1185.)

Appellants nevertheless contend that the arbitrator's failure to specifically address the claims under sections 11.5.1 and 11.6 "ignores the uncontroverted evidence and removes the LLCA's contractual requirement to timely deliver information to Appellants."[9] Once again, appellants

---

[9]    Specifically, appellants claim it was undisputed that unaudited quarterly financial statements were not provided until well after the applicable deadlines; that no cash flow statement for any quarter of 2021 was

19

improperly attempt to obtain judicial review of the arbitrator's factual findings under the guise of claiming the arbitrator rewrote the parties' contract. (See *Delaney v. Dahl* (2002) 99 Cal.App.4th 647, 655–656 [rejecting attempt to "style the arbitrator's decision as one exceeding the limits of the powers conferred by the retainer agreements"].) Even assuming for the sake of argument that appellants' contentions are true, it simply means the arbitrator erred in her evaluation of the evidence that all informational disclosures required under the LLCA were made. But such error on a submitted issue, even one that "causes substantial injustice," does not demonstrate that the arbitrator exceeded her powers. (*Moncharsh, supra,* 3 Cal.4th at p. 33.)

Appellants next contend the arbitrator impermissibly limited their informational rights under the LLCA to what can be obtained under the JAMS Rules for discovery. In appellants' view, the arbitrator wrongfully construed the August 19 letter as a request for " 'litigation discovery' " rather than an exercise of their right to financial disclosures under Article 11 of the LLCA. We again are unpersuaded. The arbitrator was within her powers to determine, based on the language, timing, and circumstances of the August 19 letter, that the request for information went beyond the scope of the informational rights afforded under the LLCA, and were instead sweeping discovery requests subject to the JAMS Rules. The arbitrator's arguable construction of the scope of the informational rights provisions, which were based on the facts and evidence presented, did not exceed her powers. (*AMD, supra*, 9 Cal.4th at p. 378.)

---

ever provided; and that respondents failed to timely disclose a $200 million letter of credit as required under section 11.6.

### c. Audited Annual Financial Statement (§ 11.5.2)

In rejecting appellants' claim for breach of section 11.5.2 of the LLCA, the arbitrator acknowledged that the audited financial statement for fiscal year 2020 was "late" but found the noncompliance to be excused because the audit could not be completed on time due to the replacement of the Company's auditor in the first quarter of 2021. Appellants contend that the auditor's decision was in excess of her powers. We disagree.

The Supreme Court's decision in *Gueyffier* is instructive. There, a franchisee sued a franchisor in arbitration for failing to provide promised assistance as required by their franchise agreement. (*Gueyffier*, *supra*, 43 Cal.4th at pp. 1181.) The franchise agreement required the franchisee to give the franchisor notice and an opportunity to cure any alleged breach, but the franchisee failed to comply with this provision. (*Id.* at pp. 1182–1183.) The franchise agreement also contained a general clause prohibiting the arbitrator from modifying or changing any material term of the contract. (*Id.* at p. 1183.) In ruling in favor of the franchisee, the arbitrator excused the franchisee's failure to comply with the notice and cure provision, concluding the franchisor's breach "was not curable." (*Id.* at p. 1183.)

The Supreme Court held the arbitrator did not exceed his powers by applying an equitable excusal defense to the notice and cure requirement, notwithstanding the no-modification provision. (*Gueyffier*, *supra*, 4 Cal.4th at p. 1185.) As *Gueyffier* explained, "California law allows for equitable excusal of contractual conditions causing forfeiture in certain circumstances, including circumstances making performance futile," and the no-modification provision "did not unambiguously prohibit the arbitrator from *excusing performance* of a contractual condition where the arbitration concluded performance would have been an idle act." (*Id.* at pp. 1185–1186.) "[T]o

21

excuse performance of a contract term in a specific factual setting is not, in ordinary usage at least, to 'modif[y] or change[]' the term. The no-modification clause did not 'explicitly and unambiguously' [citation] bar the arbitrator from deciding that article 7.2's notice-and-cure provision was inapplicable on the facts of the case as he found them." (*Ibid.*, italics omitted.)

*Gueyffier*'s rationale aptly applies here. "The arbitrator was empowered to interpret and apply the parties' agreement to the facts [she] found to exist; included therein was the power to decide when particular clauses of the contract applied. In concluding the [120-deadline of section 11.5.2 of the LLCA] was inapplicable on the facts as [she] found them, the arbitrator did no more than exercise this power." (*Gueyffier, supra*, 43 Cal.4th at p. 1185.) Because appellants cite no provision of the LLCA expressly and unambiguously preventing the arbitrator from excusing noncompliance with section 11.5.2 of the LLCA, they fail to demonstrate that the arbitrator exceeded her powers.

Appellants nevertheless maintain that the arbitrator's finding "contradicted contemporaneous documents and testimony from the hearing that informed the arbitrator that the Board approved the change of auditor on the understanding that the audit would be completed on time." Once again, appellants simply attempt to dispute the arbitrator's factual and legal determinations that an equitable excusal defense applied on the facts before her. Right or wrong, the arbitrator's resolution of disputed issues submitted for her decision is what the parties bargained for and is therefore not subject to judicial review. (*California Union Square, supra*, 50 Cal.App.5th at p. 348.)

22

### 3. Mutual Release and MSA

Appellants contend the arbitrator exceeded her powers by "remov[ing] the general release and cost cap from the Mutual Release, effectively allowing [r]espondents to seek any cost reimbursement from previous MSAs." Again, we disagree.

The arbitrator found that respondents' claim for $7.5 million was not for management costs, but for the return of a security deposit that NV Energy mistakenly remitted to the joint venture rather than to the parent company, 8minute Solar. As such, the arbitrator did not "remove" or disregard the release provision and cost cap so much as find that the $7.5 million claim was not subject to either term. This decision involved interpreting the applicable contractual language to determine what constituted a "management cost" for purposes of the cost cap, as well as what types of claims were released under the Mutual Release. Because the arbitrator's decision was based on an arguable interpretation of the contracts, it is not subject to judicial review. (*AMD*, *supra*, 9 Cal.4th at p. 378.)

### 4. Relief Not Authorized by Contract or Law

Appellants next contend the arbitrator's award of more than $4.5 million on an "unpled" claim for investigative expenses was not authorized by the LLCA or the law because the expenses were not related to the arbitration. Appellants further contend the trial court impermissibly awarded appellants attorney fees incurred during postarbitration judicial proceedings. We reject both contentions.

### a. Brown Rudnick Investigation Expenses

There is no question the arbitrator had broad authority to determine what fees and expenses would be awarded to the prevailing party in the arbitration. The parties agreed to arbitrate their disputes under JAMS Rule

23

24(c), which provides that "[t]he Arbitrator may grant any remedy or relief that is just and equitable and within the scope of the Parties' Agreement, including, but not limited to, specific performance of a contract or any other equitable or legal remedy." " 'This type of rule "has been described as 'a broad grant of authority to fashion remedies' . . . and as giving the arbitrator 'broad scope' in choice of relief." ' " (*Mave Enters. v. Travelers Indem. Co.* (2013) 219 Cal.App.4th 1408, 1431.)

Appellants nevertheless maintain that the arbitrator acted outside her authority because respondents' claim for attorney fees incurred in the Brown Rudnick investigation "was never mentioned in the arbitration until an add-on to [r]espondents' post-hearing fee application, after the merits of the arbitration were decided." Based on this, appellants claim the posthearing issue was not properly "submitted to arbitration" for decision. We disagree. The arbitrator could reasonably determine that the issue was properly submitted for decision, as both parties requested an award of attorney fees, costs, and other expenses of arbitration in their arbitration pleadings. Moreover, the award was appropriately deferred until after the merits hearings on the parties' claims and counterclaims, as per the prehearing scheduling order stating the arbitrator would consider all requests for attorney fees and costs after the issuance of the interim ruling, which the arbitrator would provide within 30 days after the later of the close of the arbitration hearings or the submission of posthearing briefs.

Appellants next contend the Brown Rudnick expenses were not awardable under section 5.9.2 of the LLCA because they related to the Company's annual audit and not to the arbitration. But in light of the highly deferential standard of review applicable to contractual arbitration awards, this contention is likewise unavailing.

24

As discussed, section 5.9.2 of the LLCA set forth the applicable dispute resolution procedures and authorized the arbitrator to award the "fees and expenses of such arbitration proceedings" to the prevailing party. Here, the arbitrator was presented with evidence that the Brown Rudnick expenses were incurred "solely as a result of" appellants' fraud allegations in their initial arbitration demand, as these allegations prevented the Company's auditors from relying "on standard management representations," and required an investigation and report into appellants' claims in order for the auditors to proceed with the annual audit. In short, the evidence arguably showed that the Brown Rudnick expenses were rationally related to the arbitration. (See *Gueyffier*, *supra*, 43 Cal.4th at p. 1182 [arbitrator has authority to "award any relief rationally related to his or her factual findings and contractual interpretation"].)

Even if we accept that the arbitrator's decision entailed a broad interpretation of what constituted arbitration-related expenses under section 5.9.2, it was still an arguable interpretation of the LLCA, and thus, it did not constitute an act in excess of the arbitrator's powers. (*AMD*, *supra*, 9 Cal.4th at pp. 378, 381 [in close cases, arbitrator's decision must stand].) Because the recovery or nonrecovery of arbitration-related expenses was "one of the 'contested issues of law and fact submitted to the arbitrator for decision,' the arbitrators' decision was final and could not be judicially reviewed for error." (*Moore v. First Bank of San Luis Obispo* (2000) 22 Cal.4th 782, 787.) Here, having submitted the issue of expenses to arbitration, appellants are hard-pressed to maintain that the arbitrator exceeded her powers by deciding it, even if she decided it incorrectly. (*Ibid*.)

Appellants contend that the arbitrator's decision contradicted the express and unambiguous language of section 14.6 of the LLCA, which bars

awards of "special, indirect, punitive or consequential damages resulting or arising out of this Agreement, including loss of profit." As discussed above, however, the Brown Rudnick expenses were arguably arbitration-related expenses for purposes of section 5.9.2 of the LLCA, not consequential damages. Thus, section 14.6 was not a bar, let alone a clear and unambiguous one, to such relief. (See *Gueyffier*, *supra*, 43 Cal.4th at p. 1182.)

### 5. Attorney Fees for Postarbitration Judicial Proceedings

Finally, appellants contend the trial court erred in awarding respondents attorney fees for successfully petitioning to confirm the arbitration award and opposing the petition to vacate it. According to appellants, the fee shifting language of section 5.9.2 of the LLCA does not extend to postarbitration judicial proceedings. We disagree.

Costs incurred in "any judicial proceeding" to enforce an arbitration award are recoverable by the prevailing party. (§ 1293.2; *Marcus & Millichap Real Estate Investment Brokerage Co. v. Woodman Investment Group* (2005) 129 Cal.App.4th 508, 513.) Attorney fees are recoverable as costs if authorized by contract, statute, or law. (§ 1033.5, subd. (a)(10)(A).) The determination of the legal basis for an attorney fee award is a question of law, which is reviewed de novo. (*Connerly v. State Personnel Board* (2006) 37 Cal.4th 1169, 1175.)

Section 5.9.2 of the LLCA provides that the parties must resolve their disputes "in accordance with the dispute resolution procedures set forth in Section 14.20; provided, however, that the fees and expenses of *such arbitration proceedings* (including, without limitation, reasonable attorneys' fees) shall be borne" 100 percent by the Class B investors if the arbitrator finds in favor of management. (Italics added.) The phrase "such arbitration

26

proceedings" necessarily refers back to "the dispute resolution procedures set forth in Section 14.20" in the prior clause.  (See *Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 70–71 [meaning of contract must be derived from reading contract as a whole, with individual provisions interpreted together].)  Section 14.20 states in relevant part that "[t]he award rendered by the arbitrator shall be binding and final, and judgment may be entered upon it in accordance with applicable Law in any court having jurisdiction thereof."

Thus, section 5.9.2 contemplates that the "arbitration proceedings" for which fees shall be awarded include court proceedings to obtain a judgment on the arbitration award.  Accordingly, we conclude on our de novo review that section 5.9.2 provides a contractual basis for the award of attorney fees incurred during postarbitration judicial proceedings.  (§§ 1033.5, subd. (a)(10)(A), 1293.2.)

Appellants' reliance on *Cohen v. TNP 2008 Participating Notes Program, LLC* (2019) 31 Cal.App.5th 840 is unavailing, as the court there held that arbitration proceedings were distinct from postarbitration judicial proceedings for the purposes of determining prevailing party status in the latter.  (*Id.* at pp. 878–879.)  Here, there is no prevailing party issue, as respondents prevailed in both the arbitration and postarbitration judicial proceedings.

## DISPOSITION

The order granting respondents' petition to confirm the arbitration award and denying appellants' cross petition to vacate the award is affirmed. Respondents shall receive their costs on appeal.

27

_____
Fujisaki, J.

WE CONCUR:


_____
Tucher, P.J.


_____
Rodríguez, J.

*8MINUTENERGY US MANAGER, LLC et al. v. MDS CAPITAL, LLC et al.,* (A165588)